IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLASS W. HYSELL, | No. CIV S-04-0355-FCD-CMK-P |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| C.K. PLILER, et al., | |
| Defendants. | |

Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5.  Pending before the court are:  (1) plaintiff's motion for summary judgment (Docs. 141, 142, and 143); and (2) defendants' cross-motion for summary judgment (Docs. 144 and 145).  Plaintiff has filed an opposition (Doc. 147) to defendants' motion for summary judgment.

///

///

///

///

# I. BACKGROUND

## A. Plaintiff's Allegations

This action proceeds on plaintiff's second amended complaint concerning events which allegedly occurred while plaintiff was housed at California State Prison – Sacramento ("CSP–Sac."), from May 12, 1998, to February 24, 2004. Plaintiff seeks monetary damages and injunctive relief. In general, plaintiff claims that defendants denied him "essential items needed to practice [his] religion, without a compelling governmental reason and without being the least restrictive means. . . ." Specifically, plaintiff asserts that he practices the Wiccan religion and has been denied various artifacts necessary to his religious beliefs, has not been allowed to watch Wiccan videos, and has been denied access to Wiccan religious services. In his motion for summary judgment, plaintiff states:

> My argument is simple, the defendants admitted that the items I kept having problems receiving as ordered are essential to the practice of my religion. They have admitted that Azure Green was an approved vendor. . . . Yet I was repeatedly denied these items when they were needed. The different sabbats [Wiccan religious ceremonies] represent different changes in energies. Every day of the week has a planetary correspondence, so does each hour of the day and night. It is a constant thing. Certain rituals can only be done at certain times. The denial of our orders [for Wiccan materials] put a substantial burden on us and all the defendants did was make conclusory statements as to safety and security or contraband, but this doesn't hold water because the Court can look at the orders that were returned and see there was no security concerns or any contraband.

Plaintiff makes clear that he is asserting a violation of his rights under the First Amendment and RLUIPA.

## B. Undisputed Facts

Based on a review of defendants' statement of undisputed facts and exhibits in support thereof, plaintiff's exhibits, and the transcript of plaintiff's deposition, the court finds the following facts are undisputed:

1.  Plaintiff's current religious faith consists of an amalgam of several different belief systems, including Kabbalah;

2. Plaintiff is a co-founding member of a religious group called Hekau Ya Aset, which is a non-profit corporation identified with a tax identification number;

3. Plaintiff's religion involves various Wiccan ceremonial observances, called Sabbats and Esbats;

4. Group participation among adherents is generally required to observe the Sabbats;

5. Plaintiff's religion follows the Wiccan calendar;

6. In 1993, another inmate – Rouser – filed a lawsuit against prison officials claiming that he was being denied the right to practice his religion, Wicca;

7. In 1997, the parties to the Rouser lawsuit entered into a settlement agreement which provided for the following:

   a. Rouser would be permitted access to particular editions of a Witches' Bible and Tarot cards;

   b. Rouser would be permitted access to a room for bi-weekly Esbats and eight seasonal Sabbats;

   c. Rouser would be permitted access to various religious artifacts used at observances of the Esbats and Sabbats;

   d. A volunteer Wiccan advisor would be permitted to attend the Esbats and Sabbats;

   e. Prison officials could take into account the number of adherents, room availability, safety, and security in permitting Rouser and others access to the room for their spiritual observances;

   f. Except for access to the Witches' Bible, prison officials could suspend the terms of the agreement for security reasons or if Rouser was confined in the Security Housing Unit or administrative segregation;

8. A volunteer Wiccan advisor was approved and provided religious services to inmates;

9. Esbat services were provided for on a weekly basis;

10. When a Sabbat was requested, the prison official in charge of religious programs made arrangements for such services;

///

11. Wiccan inmates did not always request that each of the eight Sabbats be held;

12. To request a Sabbat, an inmate was required to submit a form requesting a future Sabbat be held, such form to be submitted at least 30 days prior to the requested Sabbat;

13. The Yule Sabbat was not held at CSP–Sac. in December 2003;

14. Wiccan inmates have access to religious artifacts, either through the Wiccan spiritual advisor who brings such items with him, or at the prison where the items are stored in a locked room;

15. Prison staff have been issued instructional memoranda regarding the policies governing receipt of religious artifacts ordered by an inmate from various outside vendors;

16. Inmates have been issued instructional memoranda regarding the policies governing proper ordering of artifacts;

17. Plaintiff has been denied access to religious artifacts ordered from outside vendors, including Azure Green, because prison officials determined such items were either aphrodisiacs or could be used as drug precursors;

18. Wiccan inmates are permitted to construct altars out of wood, which are then stored in the locked room with other artifacts;

19. The California Department of Corrections and Rehabilitation ("CDCR") does not provide a full-time or part-time Wiccan advisor at state expense, but does allow inmates access to a volunteer advisor; and

20. Plaintiff has an extensive inmate disciplinary history.

While the events alleged in this action occurred while plaintiff was housed at CSP–Sac., defendants outline the following undisputed facts concerning Wiccan religious services at Pleasant Valley State Prison ("PVSP"), which is where plaintiff is currently housed:

1. At PVSP, Wiccans are allowed to practice their faith, including the Esbats and Sabbats, and have access to chapel facilities on Mondays from 9:30 a.m. to 11:30 a.m.;

2. Wiccans at PVSP are allowed access to various religious artifacts, which include wands, non-flammable oils, salt, altars, altar cloths, a deity figurine, and an approved musical instrument;

3. Wiccans at PVSP are also allowed access to the Book of Shadows and Tarot cards;

4

4. Wiccans at PVSP may also have access to various tones contained in a bag so long as the bag is no larger than one and one-half inches in diameter;

5. Wiccans at PVSP, including plaintiff, are allowed to purchase artifacts from approved outside vendors, including Azure Green;

6. While volunteer Wiccan advisors have been approved by PVSP in the past, at present no such individual has requested approval; and

7. In the absence of an approved volunteer religious advisor, the prison warden has discretion to approve an inmate to minister to the religious needs of inmates.

Finally, defendants outline the following undisputed facts concerning exhaustion:

1. Plaintiff filed an inmate grievance on December 24, 2001 (log no. 02-00139), regarding religious items ordered from Azure Green five weeks earlier but which had not been received;

2. The grievance was partially granted at the first level and plaintiff did not appeal the matter further;

3. Plaintiff filed an inmate grievance on June 28, 2002 (log no. 02-01611), regarding prison officials' refusal to deliver a book about Tai Chi;

4. The grievance was denied at the informal level because prison officials believed that depictions of martial arts combat techniques posed a threat to institutional security and safety;

5. Plaintiff submitted a first level appeal concerning this grievance, but later withdrew it;

6. A group inmate grievance was submitted by plaintiff and others, including Rouser, on July 17, 2002 (log no. 02-01846), claiming that they had been denied access to religious services the previous day;

7. The grievance was partially granted at the first level and not appealed further by any member of the group;

8. Plaintiff filed an inmate grievance on September 24, 2002 (log no. 02-02408), claiming that an order for herbs placed with Azure Green had been withheld by prison officials;

9. This grievance was denied at the first level because prison officials concluded that the herbs in question here aphrodisiacs;

10. Plaintiff appealed to the second level;

11. The second level appeal was denied;

| | | |
|---|---|---|
| 1 | 12. | Plaintiff did not proceed to the third level of review as to this grievance; |
| 2 | 13. | Plaintiff filed an inmate grievance on October 25, 2002 (log no. 02-02780), claiming that he had not received Sabbat items ordered from Azure Green; |
| 4 | 14. | Plaintiff later withdrew this grievance; |
| 5 | 15. | Plaintiff filed an inmate grievance on March 7, 2003 (log no. 03-00778), claiming that a package from Azure Green had again been improperly returned by the prison mailroom; |
| 7 | 16. | This grievance was denied at the first and second levels; |
| 8 | 17. | Plaintiff did not appeal to the Director's level. |

## II. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary

1  judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

2  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III.  DISCUSSION

In their motion for summary judgment, defendants argue:  (1) plaintiff's claims against defendant Hamad are unexhausted; (2) plaintiff is not entitled to relief on the merits;[1] (3) plaintiff's claims for injunctive relief are moot;[2] and (4) defendants are entitled to qualified immunity.  In his motion for summary judgment, plaintiff argues on the merits that defendants' conduct resulted in a substantial burden on the practice of his religion because it was neither narrowly tailored nor based on legitimate penological interests.

**A.    Exhaustion**

Prisoners seeking relief under § 1983 must exhaust all available administrative remedies prior to bringing suit.  See 42 U.S.C. § 1997e(a).  This requirement is mandatory regardless of the relief sought.  See Booth v. Churner, 532 U.S. 731, 741 (2001) (overruling Rumbles v. Hill, 182 F.3d 1064 (9th Cir. 1999)).  Because exhaustion must precede the filing of the complaint, compliance with § 1997e(a) is not achieved by exhausting administrative remedies

---

[1] Because plaintiff does not claim that his equal protection rights were violated, the court does not reach defendants' arguments under the Fourteenth Amendment.  The court will address the merits of plaintiff's claims under the First Amendment and RLUIPA only.

[2] Defendant Woodford was, at the times relevant to the complaint, the Director of the CDCR.  As such, this action would properly proceed against her successor.  Therefore, plaintiff's injunctive relief claims would not be mooted by his transfer from CSP–Sac. Moreover, defendants' argument that Wiccan inmates at PVSP – where plaintiff is housed now – are allowed to practice their religion would not moot plaintiff's claim that the CDCR director is violating his right to practice his faith.

8

while the lawsuit is pending.  See McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002).  The Supreme Court recently addressed the exhaustion requirement in Jones v. Bock, 127 S.Ct. 910 (2007), and held: (1) prisoners are not required to specially plead or demonstrate exhaustion in the complaint because lack of exhaustion is an affirmative defense which must be pleaded and proved by the defendants; (2) an individual named as a defendant does not necessarily need to be named in the grievance process for exhaustion to be considered adequate because the applicable procedural rules that a prisoner must follow are defined by the particular grievance process, not by the PLRA; and (3) the PLRA does not require dismissal of the entire complaint if only some, but not all, claims are unexhausted.  The Supreme Court also held in Woodford v. Ngo that, in order to exhaust administrative remedies, the prisoner must comply with all of the prison system's procedural rules ". . . so that the agency addresses the issues on the merits."  126 S.Ct. 2378, 2385-88 (2006).  Thus, exhaustion requires compliance with "deadlines and other critical procedural rules."  Id. at 2386.  Partial compliance is not enough.  See id.

        A prison inmate in California satisfies the administrative exhaustion requirement by following the procedures set forth in §§ 3084.1-3084.7 of Title 15 of the California Code of Regulations.  In California, inmates "may appeal any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare." Cal. Code Regs. tit. 15, § 3084.1(a).  These regulations require the prisoner to proceed through several levels of appeal:  (1) informal resolution; (2) formal appeal; (3) second level appeal to institution head; (4) third level appeal to the director of the California Department of Corrections and Rehabilitation.  A decision at the third formal level, which is also referred to as the director's level, is not appealable and concludes a prisoner's departmental administrative remedy.  See Cal. Code Regs. tit. 15, §§ 3084.1(a) and 3084.5(e)(2). Departmental appeals coordinators may summarily reject a prisoner's untimely administrative appeal.  See Cal. Code Regs. tit. 15, §§ 3084.3(c)(6) and 3084.6(c).   If a group of inmates intend to appeal the same decision or action, one grievance form is used and a list of the participating inmates must be attached.  The list must

be legible and state the inmates' names, departmental identification numbers, and housing assignment. The form must also be signed by all participating inmates. Currently, California regulations do not contain any provision specifying who must be named in the grievance.

In certain circumstances, the regulations make it impossible for the inmate to pursue a grievance through the entire grievance process. See Brown v. Valoff, 422 F.3d 926, 939 n. 11 (9th Cir. 2005). Where a claim contained in an inmate's grievance is characterized by prison officials as a "staff complaint" and processed through a separate confidential process, prison officials lose any authority to act on the subject of the grievance. See id. at 937 (citing Booth, 532 U.S. at 736 n. 4). Thus, the claim is exhausted when it is characterized as a "staff complaint." See id. at 940. If there are separate claims in the same grievance for which further administrative review could provide relief, prison regulations require that the prisoner be notified that such claims must be appealed separately. See id. at 939. The court may presume that the absence of such a notice indicates that the grievance did not present any claims which could be appealed separate from the confidential "staff complaint" process. See id.

Defendants argue that plaintiff's claims as against defendant Hamad are not exhausted. Specifically, defendants assert:

> In his [amended] complaint plaintiff admits that he did not complete the grievance process with regard to his claims against defendant Hamad. Plaintiff did not comply with the applicable grievance procedures and, therefore, his claims against defendant Hamad are barred. [¶] . . . [¶] In his amended complaint, plaintiff admits that CSP-Sac. had a grievance process, and that his refusal to cooperate with the grievance process caused his appeal to be canceled. (citation omitted). [¶] Plaintiff failed to "properly" exhaust his administrative remedies with regard to his claims against defendant Hamad. Accordingly, those claims should be dismissed.

Defendants do not specify which claims against Hamad are unexhausted.

In their moving papers, defendants outline a number of undisputed facts concerning exhaustion. In particular, they reference six separate inmate appeals, either filed by plaintiff individually or by a group including plaintiff, which were not pursued through the Director's level of review. None of these grievances references any particular defendant. Rather,

they all concern plaintiff's claims regarding specific instances of items not being received or religious services being denied.

Given that the evidence offered by defendants regarding exhaustion does not specifically relate to defendant Hamad, the court will construe defendants' exhaustion argument more broadly to assert that claims in general (as opposed to claims as against a specific defendant in particular) are unexhausted. Such a construction of defendants' argument is consistent with Jones v. Bock, which does not require that particular defendants be listed in a plaintiff's exhaustion grievances. All that is required is that claims in general be outlined in the grievance process.

Having carefully reviewed the undisputed evidence concerning exhaustion submitted by defendants, the court concludes that none of the six grievances referenced (log nos. 02-00139, 02-01611, 02-01846, 02-02408, 02-02780m and 03-00778) were pursued through a decision at the final level of administrative review. To the extent plaintiff raises in the second amended complaint claims relating to those grievances, such claims are unexhausted and, therefore, barred.

**B.    The Merits**

1.    First Amendment Claim

The United States Supreme Court has held that prisoners retain their First Amendment rights, including the right to free exercise of religion. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). Thus, for example, prisoners have a right to be provided with food sufficient to sustain them in good health and which satisfies the dietary laws of their religion. See McElyea v. Babbit, 833 F.2d 196, 198 (9th Cir. 1987). Prison officials are also required to provide prisoners facilities where they can worship and the opportunity for clergy or spiritual leaders to visit the prison. See Glittlemacker v. Prasse, 428 F.2d 1, 4 (3rd Cir. 1970). Officials are not required to supply clergy at state expense. See id.

///

1  However, the court has also recognized that limitations on a prisoner's free
2  exercise rights arise from both the fact of incarceration and valid penological objectives.  See id.
3  at 197.  For instance, the penological interest in a simplified food service has been held sufficient
4  to allow a prison to provide orthodox Jewish inmates with a pork-free diet instead of a
5  completely kosher diet.  See Ward v. Walsh, 1 F.3d 873, 877-79 (9th Cir. 1993).  Similarly,
6  prison officials have a legitimate penological interest in getting inmates to their work and
7  educational assignments.  See Mayweathers v. Newland, 258 F.3d 930, 38 (9th Cir. 2001)
8  (analyzing Muslim inmates' challenge to prison work rule).

9  Prison regulations alleged to infringe on the religious exercise right must be
10 evaluated under the "reasonableness" test set forth in Turner v. Safley, 482 U.S. 78, 89-91
11 (1987).  See O'Lone, 382 U.S. at 349; Freeman v. Arpaio,125 F.3d 732, 736 (9th Cir. 1997)
12 (recognizing that the United States Supreme Court's decision in City of Boerne v. P.F. Flores,
13 521 U.S. 507 (1997), invalidated the Religious Freedom Restoration Act and restored the
14 "reasonableness test" as the applicable standard in free exercise challenges brought by prison
15 inmates).

16 In determining the reasonableness of a challenged restriction on First Amendment
17 rights, the court considers four factors.  First, there must be a valid, rational connection between
18 the prison regulation and the legitimate government interest put forward to justify it, and the
19 governmental objective must itself be a legitimate and neutral one.  A second consideration is
20 whether alternative means of exercising the right on which the regulation impinges remain open
21 to prison inmates.  A third consideration is the impact accommodation of the asserted right will
22 have on guards, other inmates, and the allocation of prison resources.  The absence of ready
23 alternatives is evidence of the reasonableness of a prison regulation.  See Allen v. Toombs, 827
24 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at 89-91).

25 To prevail, the prisoner must establish that the defendants substantially burdened
26 the practice of his religion by preventing him from engaging in conduct mandated by his faith.

See Freeman,125 F.3d at 732, 736.  To show a substantial burden, the prisoner must demonstrate that prison officials' conduct ". . . burdens the adherent's practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates." Graham v. Commissioner, 822 F.2d 844, 850-51 (9th Cir. 1987).  The burden must be more than a mere inconvenience.  See id. at 851.

Defendants' argument on the merits of plaintiff's First Amendment claims is as follows:

> . . . Plaintiff has failed to [establish a substantial burden].  While he claims that his access to certain religious artifacts was delayed or, on one occasion denied, he has failed to show that []his religious practice was burdened by denial of any particular artifacts.  On the contrary, plaintiff was given herbs not disallowed by the institution, and he was given access to other artifacts he ordered from Azure Green. (citation to record omitted). . . . [¶] The undisputed facts make clear that the Wiccan inmates were accommodated whenever possible, taking into account the safety and security of the institution.  Plaintiff has offered nothing to suggest that these accommodations were inadequate.  While there may have been isolated instances in which group practice was made more difficult, plaintiff has admitted that he is able to practice his religion effectively without the benefit of others.

Plaintiff's opposition is based largely on his argument that, while prison officials have issued memoranda listing various items allowed for Wiccan religious practice, he was nonetheless denied such items on several occasions.  Plaintiff suggests this shows some motive other than a legitimate penological interest must be at work.

The court finds that plaintiff cannot establish the necessary level of burden with respect to his practice of the Wiccan faith in order to prevail on a First Amendment claim.  Specifically, the undisputed facts clearly show that prison officials have developed extensive and quite generous policies governing the practice of Wicca in prisons.  For example, as outlined in the court's January 29, 2007, order concerning plaintiff's motion to compel further responses to his requests for production of documents, defendants produced, among other documents, the following:

1. January 8, 1998, memorandum concerning implementation of a settlement agreement in <u>Rouser v. White</u>, No. CIV S-93-0767-LKK-GGH, on Wiccan religious practices;

2. May 11, 1999, memorandum concerning <u>Rouser v. White</u>;

3. June 21, 1999, memorandum concerning inmate Rouser's Wiccan religious practices;

4. August 4, 1999, memorandum concerning inmate Rouser;

5. October 25, 2001, and October 16, 2002, memoranda concerning Wiccan Samhain celebration;

6. March 21, 2002, "Master Ducat Sheet" showing plaintiff's name under the listing for "Chapel/Wiccan Service;"

7. April 29, 2002, April 15, 2003, March 24, 2004, and March 26, 2004, memoranda concerning Wiccan Beltane Sabbat celebration;

8. September 20, 2002, August 21, 2003, and September 5, 2003, memoranda concerning Wiccan Autumn Equinox Sabbat celebration;

9. January 15, 2003, and January 5, 2004, memoranda concerning Wiccan Imbolg Sabbat celebration;

10. February 13, 2003, and February 19, 2004, memoranda concerning Wiccan Spring Equinox Sabbat celebration;

11. May 15, 2003, June 4, 2003, and May 11, 2004, memoranda concerning Wiccan Summer Solstice Sabbat celebration;

12. July 1, 2003, memorandum concerning Wiccan Lamas Sabbat celebration;

13. November 24, 2003, and December 11, 2003, memoranda concerning Wiccan Yul Sabbat celebration; and

14. August 1, 2001, and February 5, 2002, memoranda concerning Wiccan religious artifacts.

These documents show prison officials adequately provide for the practice of plaintiff's religion.

The question, then, is whether the specific instances where plaintiff was denied access to various artifacts he claims are necessary to practice his religion resulted in a substantial burden. The court concludes that the evidence establishes they did not. In particular, plaintiff was either denied materials because of legitimate penological concerns for institutional safety or the denial of materials was admitted by prison officials to be an error and efforts were taken to

rectify the situation. In other words, the instances plaintiff complains of were either justified by a substantial governmental interest or only resulted in an inconvenience to the practice of his faith. Further, plaintiff has presented no evidence to establish that he was prevented from adhering to any tenet of his faith.

2.   RLUIPA Claim

Under RLUIPA, the government is not permitted to impose a substantial burden on the religious practices of confined persons unless there is a compelling state interest in doing so. See Cutter v. Wilkinson, 544 U.S. 709, 720 (2005). For a burden to be substantial under RLUIPA, it must be oppressive to the extent that it renders religious exercise "effectively impracticable." San Jose Christian College v. City of Morgan Hill, 360 F.3d 1024, 1034-35 (9th Cir. 2004). For the reasons discussed above, the court concludes that plaintiff cannot establish the requisite burden.

**C.   Qualified Immunity**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If, and only if, a violation can be made out, the next step is to ask whether the right was clearly established. See id. The first two steps in the qualified immunity analysis involve purely legal questions. See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996). In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

In this case, the court concludes that plaintiff cannot establish the violation of any constitutional right. Specifically, plaintiff's First Amendment claim fails because the evidence demonstrates that any burden on the practice of his religion was not substantial. Therefore, defendants are entitled to qualified immunity.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Plaintiff's motion for summary judgment (Docs. 141, 142, and 143) be denied;

2. Defendants' motion for summary judgment (Docs. 144 and 145) be granted; and

3. The Clerk of the Court be directed to enter judgment against plaintiff and in favor of defendants and to close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 11, 2008

_____
CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE